**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN E. HOUSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 0002 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Susan Houser, seeks review of the final decision of the Commissioner of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Ms. Houser asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Houser applied for DIB on August 18, 2008, alleging that she had been disabled since June 9, 2006 due to congestive heart failure and leg problems. (Administrative Record "R." 142, 177). Her application was denied initially on December 31, 2008, and upon reconsideration on January 10, 2008. (R. 94, 105). Ms. Houser then filed a timely request for a hearing on June 1, 2009. (R. 109).

An administrative law judge ("ALJ") convened a hearing on February 12, 2010, at which Ms. Houser, represented by counsel, appeared and testified. (R. 38-77). At the hearing, Lee Knutson testified as an impartial vocational expert. (R. 36, 78-88). On July 23, 2010, the ALJ issued an

unfavorable decision, denying Ms. Houser's application for DIB because she could still engage in light work. (R. 10-27). This became the Commissioner's final decision when the Appeals Council denied Ms. Houser's request for review on November 4, 2011. (R. 1-3); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004); *see* 20 C.F.R. §§ 404.955, 404.981. Ms. Houser has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Houser was born on November 20, 1960, making her forty-nine years of age at the time of the ALJ's decision. (R. 10,142). She completed two years of college. (R. 182). Ms. Houser has not worked since 2006. (R. 177). Her last job was as an accounts payable clerk; the job is considered to be at the lower end of skilled work, and is sedentary in physical demand. (R. 78-79, 178). Prior to that, Ms. Houser worked as an accountant. (R. 178).

### B.
### The Medical Evidence

#### 1.
#### The Plaintiff's Physicians

Ms. Houser has had heart issues that date back to 2008. On January 29, 2008, she was seen by Dr. William Mikaitis for pneumonia. (R. 535). A chest x-ray was taken and she was diagnosed with bilateral pulmonary infiltrate. (R. 535). The next month she was seen again, this time for difficulty breathing. (R. 545). Another chest x-ray was taken, revealing an enlarged heart. (R. 545). The imaging also revealed small bilateral pleural effusions and right perihilar air space opacity,

which was noted as perhaps indicating pneumonia or edema. Dr. Micaletti, the reviewing physician, noted that the heart appeared slightly worse since her x-ray the month prior. (R. 545).

The next day, on February 23, 2008, Ms. Houser was seen at Urgent Care for worsening shortness of breath. (R. 300). At Urgent Care, an x-ray was taken revealing fluid around her heart, so Ms. Houser was transported to the emergency room for further evaluation. (R. 298, 300). At the hospital, treating physician Dr. Justyna Stengele noted that Ms. Houser had severe shortness of breath and difficulty breathing. (R. 300). Ms. Houser reported to the doctor that she had been experiencing shortness of breath on exertion and while lying down for several years, with her symptoms worsening that month. (R. 300). The doctor noted that Ms. Houser experienced shortness of breath and difficulty breathing "with any activity, just walking to the door." (R. 298). Dr. Stengele also noted Ms. Houser's history of depression, for which she was taking Cymbalta, and also her anxiety, colitis, and arthritis. (R. 300).

Dr. Stengele referred Ms. Houser to cardiology, and an echocardiogram was administered. (R. 301, 294). Dr. Muaia Martini described the echocardiogram as a "grossly abnormal study". (R. 294). Dr. Martini diagnosed poor left ventricular systolic function, with an estimated ejection fraction of 10% or less. (R. 294). The doctor also noted a small mobile apical mural thrombus, evidence of mildly elevated pulmonary systolic hypertension, and mild-to-moderate mitral and tricuspid regurgitation. (R. 294). Dr. Martini said that Ms. Houser was experiencing chronic heart failure, and Dr. Stengele also listed his final diagnosis: severe dilated cardiomyopathy with congestive heart failure, pneumonia, and depression. (R. 294, 307). In addition to the echocardiogram, an electrocardiogram was also administered. (R. 299). The test revealed a sinus tachycardia, left atrial enlargement, left axis deviation, anterolateral ST and T- wave abnormalities.

(R. 299). Chest imaging also revealed increased density along the right heart border and an enlarged heart. (R. 369). The interpreting physician, Dr. Gregory Price, diagnosed cardiomegaly and questionable subtle right middle lobe infiltrate. (R. 369).

The next month, on March 7, 2008, Ms. Houser was seen again for a cardiovascular follow up. Dr. Colin Sumida noted that while Ms. Houser was doing better, she still had intermittent shortness of breath upon exertion. (R. 256). She was diagnosed with dilated cardiomyopathy, and the cardiologist increased her ACE inhibitors and noted that if her ejection fraction remained less than 30% she would be considered for a defibrillator. (R. 257). She was again diagnosed with depression and her 60mg Cymbalta was continued. (R. 512). One month later, the records show that Dr. Stengele wrote Ms. Houser a prescription, continuing her on Cymbalta and prescribing Ambien for anxiety. (R. 528).

In May of 2008, Ms. Houser was again seen by Dr. Sumida in connection with her cardiovascular issues. (R. 259). While her symptoms did not worsen, she continued to suffer shortness of breath upon exertion. (R 259). Her medications at this time were reported as being Ambien 10mg, Coreg 3.125 mg, Cymbalta 40 mg, Furosemide 20mg, Lisinopril 2.5 mg, Potassium Chloride 20 mEq, Warfarin Sodium 5 mg, Xanax .25 mg. (R. 259). Dr. Sumida again diagnosed dilated cardiomyopathy and recommended a follow-up echocardiogram to see whether her ejection fraction remained less than 30% and to determine whether she needed a defibrillator. (R. 260).

On October 17, 2008, another echocardiogram was conducted, revealing ejection fraction around 15%, showing no significant improvement in Ms. Houser's left ventricular function. (R. 565).

On December 5, 2008, Ms. Houser was referred by Dr. Sumida to Dr. Sunil Shroff to consider her for a prophylactic ICD defibrillator. (R. 565). Dr. Shroff noted that Ms. Houser remained "short of breath with only moderate exertion with what I will class II to III congestive heart failure" (R. 565). Ms. Houser, however, told the doctor that she recently began herbal medication and that did notice symptom improvement. (R. 566). Dr. Shroff then recommended the implantation of an ICD, stating that while it would not improve Ms. Houser's symptoms, she would "clearly benefit" because the device would prevent sudden cardiac death. (R. 566). Ms. Houser declined, preferring to wait for two months to see whether her condition improved. (R. 566).

Dr. Shroff noted that Ms. Houser continued to have heart failure symptoms, so he increased Ms. Houser's ACE inhibitor and beta-blocker doses. (R. 566). He also increased her lisinopril to 5 mg per day, recommending that upon follow up it again be increased to 10 mg per day. (R. 566). Dr. Shroff also increased Ms. Houser's carvedilol to 6.25 mg twice per day, recommending that upon follow up it again be increased to 12.5 mg twice per day. (R. 566).

On January 22, 2009, Dr. Stengele completed a cardiac report regarding Ms. Houser in connection with her DIB application. (R. 506-10). She diagnosed her with idiopathic cardiomyopathy and heart failure. (R. 506). She stated that her heart failure was demonstrated by a pulmonary edema, dyspnea, orthopnea, and paroxysmal nocturnal dyspnea. (R. 506). She noted that she experienced moderate left ventricular enlargement and 10% ejection fraction. (R. 506). Dr. Stengele noted that she underwent a 20-d echocardiography, ventriculography, and resting ECG, all in February 2008. (R. 509). Dr. Stengele noted that Ms. Houser demonstrated symptoms of inadequate cardiac output include dyspnea on exertion and at rest. (R. 509). She stated that dyspnea occurs upon ordinary physical activity and that Ms. Houser's condition limited her daily living

activities including cleaning, cooking, making beds, and shopping. (R. 510).

In a letter dated July 22, 2009, Dr. Justyna Stengele reported that Ms. Houser "suffers from nonischemic cardiomyopathy with severe left ventricular dysfunction, which significantly limits her functional capacity including activities of daily living. She also suffers from myalgia with chronic low back and bilateral knee pain. In my opinion, Susan Houser should classify for disability." (R. 584).

On April 1, 2009, Ms. Houser underwent another echocardiogram. The results revealed that her ejection fraction was around 35%. (R 585). Dr. Martini interpreted the the exam, finding moderate left ventricular enlargement with probable moderate left ventricular systolic dysfunction, mild left atrial enlargement, borderline mitral valve prolapse, and a probable mild degree of pulmonary hypertension. (R. 585). This again lead to a clinical diagnosis of cardiomyopathy. (R. 585).

On April 7, 2010, Ms. Houser underwent another echocardiogram. The results revealed that her ejection fraction again decreased to between 20-25%. (R. 639). Dr. Martini again found moderate left ventricular enlargement. In comparison to her previous echocardiogram, her left ventricular dysfunction was found to be severe rather than moderate. Dr. Martini reported that most of the ventricular septum was akinetic and the rest of the ventricle is severely diffusely hypokinetic. He again found mild left atrial enlargement and again diagnosed cardiomyopathy and congestive heart failure. Following the results, in a letter to the ALJ, Ms. Houser reported that Dr. Sumida told her that her "heart was in pretty bad shape, that it was still enlarged and that it had gotten weaker since my last Echo". (R. 641). Additionally "he asked how I was feeling and instructed me to continue the meds as prescribed in February, and said that we would discuss my test results during

my upcoming appointment." (R. 641). She also stated that in a previous appointment that February, Dr. Sumida doubled her dosage of Carvedilol in an attempt to lower her heart rate. (R 641).

On January 7, 2011, Ms. Houser again saw Dr. Sumida through a referral from her treating physician Dr. Stengele. (R. 692). Dr. Sumida stated that while Ms. Houser's shortness of breath wasn't not worsening, she still became dyspneic to one light of stars. (R. 692). Also, after walking five blocks she had to stop to catch her breath. (R. 692). She also complained of a cough, and her latest echocardiogram showed an ejection fraction of 20%. (R. 692). Under his assessment, Dr. Sumida listed dilated cardiomyopathy, fatigue/malaise, dyspnea, and cough. (693). He stated that she had severe cardiomyopathy and was still symptomatic, although she did not appear to be in any overt heart failure. He stated that she has "severe compromise in her functional capacity." He again increased her ACE inhibitors and beta blockers, and again increased her

Llisinopril to 7.5 mg. Dr. Sumida stated that Ms. Houser "understands that she is at risk for life threatening arrhythmias, worsening heart failure, and limited life expectancy." (R. 693).

Ms. Houser and her counsel submitted copies of her medical prescriptions. In January 2008, Ms. Houser was prescribed promethazine/codeine sysrume for a cough. (R. 546). Throughout 2008 she also received several prescriptions for Xanax .5 mg and Cymbalta 60 mg. (R. 551, 556). She was prescribed Lasix for her congestive heart failure and other various medications including Potassium Chloride, Coumadin, and Lisinopril. (R. 554-57). On August 17, 2009, Dr. Stengele increased Ms. Houser's Cymbalta prescription from 60 mg to 90 mg and also prescribed her Lomotil for colitis-related diarrhea. (R. 608-09).

Ms. Houser also visited the Midwest Eye Center for an initial ocular examination and follow ups due to complaints of vision difficulties and eye sensitivity. (R. 620-34). She was diagnosed with

dry eye syndrome for which she received Optive Ophthalmic Solution. (R. 622). Additionally, she

was diagnosed as needing bifocal lenses and was dispensed the requisite contact lenses. (R. 630).

**2.**
**Consultative and Reviewing Physicians**

On October 14, 2008, Ms. Houser underwent a consultative mental status evaluation in

connection with her application for benefits. (R. 476-78). J.B. Goebel, Ph.D. found that Ms. Houser

was a bright and cheerful person who laughed easily and appropriately. (R. 476). He stated that Ms.

Houser's eye contact was good and that she awakes two to five times during the night. (R. 476). Dr.

Goebel noted that Ms. Houser's day consisted of "getting up, getting her daughter up and ready for

school." Also, Ms. Houser told the Doctor that she "does some cleaning of the house and straightens

pillows. She watches TV. She cooks, shops, and drives a car, she talks to friends of hers on the

telephone at night and some friends visit her." (R. 476-77). Dr. Goebel noted that Ms. Houser

obtained the highest immediate memory score that he has seen for an adult in twenty years and was

in the 98th percentile. (R. 477). Ms. Houser told Dr. Goebel that she has always been good with

numbers, and he found that she can manage her own funds. (R. 477-78). Dr. Goebel found Ms.

Houser's intellectual level to be above average, and reported no Axis 1 or Axis II diagnosis. (R.

478).

On December 2, 2008, Ms. Houser underwent a consultative physical examination in

connection with her application for benefits. (R. 483-85). Dr. Jain noted that Ms. Houser was well

controlled with her medication, that she could walk four to five blocks with dyspnea, and could

climb about two floors without dyspnea. (R. 483). Ms. Houser was also found to have moderately

good exercise tolerance. (R. 485). Dr. Jain stated that Ms. Houser had a "history of depression on

and off with a sense of hopelessness" and that her Cymbalta "seems to have helped her." (R. 483). Under Dr. Jain's diagnostic impressions, the physician listed: History of idiopathic dilated cardiomyopathy, stable symptomatically and clinically. History of congestive heart failure, stable and compensated at the present time. History of excessive alcohol intake in the past, but claims to be slowing down at the present time. History of nicotine dependence; currently active with nicotine use. (R. 485).

On December 29, 2008, Dr. Richard Bilinsky, a non-examining consultative disability physician, concluded that Ms. Houser was stable symptomatically and clinically and that she responded well to her cardiac medication. (R. 488). He noted "Clmnt [sic] is considered partially credible. Medical evidence does not support her current allegations. Non Severe impairment." (R. 488).

On December 30, 2008, Kirk Boyenga, PhD, a non-examining consultative psychiatric expert, noted that Ms. Houser had no medically determinable impairment with respect to her mental health. (R. 489). This determination was disagreed with by another non-examining consultative expert, Dr. John Gambill. (R. 579). Dr. Gambill stated that Ms. Houser had a history of depression and alcohol abuse, and that "even though there is no currently diagnosable psych impairment, the longitudinal MER supports diagnosis of mood disorder and alcohol abuse that are non-severe. There are no significant limitations in the "B" criteria, and the ct. does not meet 12.04c." (R. 580).

On February 16, 2009, non-examining consultative physician Dr. Francis Vincent completed a "revision of prior decision" form that that referenced Ms. Houser's December 5, 2008 exam that found she was short of breath with only moderate exertion. The doctor stated that "claimants [sic] statements are partially credible based on the objective medical evidence." (R. 578).

On May 11, 2009, non-examining consultative physician Dr. Harris Faigel completed a case analysis regarding Ms. Houser's claim. He concluded that Ms. Houser's functioning from December 2, 2008 "reasonably supports an RFC with lift/carry 20/10, stand walk 6 hours, sit six hours and no other limitations or restrictions and with a medical onset of 2/1/08. Her symptoms in 6/08 were no longer present in 12/08 and are no longer fully credible." (R. 582).

On August 18, 2009, Ms. Houser underwent a psychological evaluation conducted by Clinical Psychologist Dianne Stevenson. (R. 589). Ms. Houser was referred to Ms. Stevenson by her counsel. (R. 589). Ms. Stevenson found that Ms. Houser presented as an "articulate, anxious, and depressed individual. She appears to be within the high average range of intellectual abilities." (R. 590). Ms. Stevenson stated that Ms. Houser's mod was tearful and depressed, and that she had a family history of depression. (R. 590). She reported that Ms. Houser does not sleep more than three to four hours per night and that she did not read due to an inability to focus and retain what she has read. (R. 590). Ms. Houser also was fearful of losing her home and her daughter, but she did offer spontaneous conversation throughout the examination. (R. 590). Ms. Stevenson determined that Ms. Houser does not need assistance with reading directions, completing forms and applications, or budgeting and spending money. (R. 591). Ms. Stevenson administered several psychological tests. (R. 590). Notably, on the Bender Gestalt examination, Ms. Houser "had difficulty concentrating and easily became frustrated, although she was able to correct mistakes" (R. 590). Additionally, the Minnesota Multiphasic Personality Inventory (MMPI-2) found "feelings of sadness, depression, fatigue, and weakness. Susan exhibits all these traits, as well as feelings of inadequacy, insecurity, and helplessness." (R. 591).

Ms. Stevenson found that Ms. Houser is trying to maintain a positive attitude in the face of her declining health. She reacts to stressful situations with fatigue and withdrawal from activities. She tends to be passive in her relationships, is plagued by self doubts, and feels inadequate and insecure to the point of helplessness at times." (R. 591). Ms. Stevenson reported that Ms. Houser's thinking tended to be confused and that she had difficulty concentrating. The results of Ms. Houser's depression index were reported as significant, as "she scored a 41 on the BDI, which is in the severe range (29-63) range for depression. (R. 591). Under Ms. Stevenson's diagnosis, she noted an Axis I diagnosis of recurrent depressive disorder and alcohol abuse in remission. (R. 591).

In her conclusions, Ms. Stevenson noted that Ms. Houser displayed a disturbance in intellectual, emotional, and psychological functioning. Susan's medical problems and limitations have impacted on her ability to maintain competitive employment, as well as effectively negotiating daily activities. As a result of these issues, she would be unable to perform work related to tasks that require concentration and attention to details or sustained effort… Her prognosis is felt to be poor for any substantial improvement." (R. 592). Ms. Stevenson also completed a Psychiatric Review Technique for opining that Ms. Houser's condition met Disability Listing 12.04, manifested by Depressive syndrome characterized by sleep disturbance, retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 596).

**C.**
**The Administrative Hearing Testimony**

**1.**
**The Plaintiff's Testimony**

Ms. Houser testified that she stopped working in June 2006 because she had severe depression that caused her to fall asleep at work. (R. 40). Ms. Houser stated that as a result of her

depression she has been on several different antidepressants. (R. 40). She testified that she attended mental health counseling between 2000-2002, however, because she found it ineffective, she has since limited her treatment to prescription antidepressants. (R. 43-44). As a result of her depression, Ms. Houser testified that she has no motivation and that she struggled in her everyday activities. (R. 44).

Ms. Houser said that as a result of her heart failure, she has severe fatigue. (R. 45-46). She stated that she "has problems doing anything for any length of time" and that she sometimes has shortness of breath and "heavy legs" when she goes up and down stairs. (R. 45-46, 69). When the ALJ asked Ms. Houser when she experiences shortness of breath, Ms. Houser responded that it typically occurs when she was doing regular household chores like doing a load of laundry, putting the laundry away, or cleaning a room. (R. 46-47). She stated that often she is only able to clean one half of a room before she has to sit down. (R. 46). Ms. Houser stated that she refused her physicians' recommendations to implant a defibrillator because it wouldn't improve her quality of life. (R. 48). She also testified that she has periodic nausea once or twice per week due to her medication. (R. 49).

Ms. Houser testified that she was diagnosed with colitis in 2002, and, as a result, she experiences between eight to twelve episodes of diarrhea each day. (R. 50). She stated that she was currently taking Lomotil for her colitis. (R. 50). This treatment began only in 2009, however, as Ms. Houser did not seek treatment for the condition prior. (R. 51-52).

Ms. Houser also stated that she has problems with her feet and her toes turning bluish. (R 52-53). She testified that these symptoms occur on and off, beginning when she was diagnosed with her heart condition. (R. 53). She testified that in the month prior to the hearing, her symptoms worsened and her pain increased. While Ms. Houser previously had no treatment for the condition,

she said that her physician recently proscribed Neurontin and planned on sending her for blood work. (R. 53). Ms. Houser also stated that she has knee and back pain and was taking hydrocodone for pain relief. (R 53-54).

Ms. Houser opined that she could walk five blocks, stand for twenty minutes to one half an hour, lift ten pounds, and climb two flights of stairs. (R. 54-56). She stated that she can sit for an hour and a half to two hours, however, she would have to move around while sitting. (R. 55). When questioned by her attorney, Ms. Houser testified however, that after walking five blocks she would be a little out of breath, her heart rate would increase, and she would have to sit down for around forty-five minutes. (R. 67-68). Additionally, she testified that sometimes when she climbs two flights of stairs, she has to stop on the way up to catch her breath and to ease her leg pain. (R. 68-69).

Ms. Houser testified that she cooks very little, and only simple dishes such as pasta. (R. 55). She also stated that she shops "as little as possible. I'd say once every two to three weeks." (R. 55). Ms. Houser testified that she drives her car, washes dishes, does laundry, and visits her friends at their houses about every two months.  (R. 55-56). Ms. Houser testified that she cannot vacuum and clean her house often, as she is only able to "do one chore and that's it. Like make the bed, I might make the bed and vacuum one room at a time." (R. 56). After vacuuming, she testified, she experiences an increase in heart rate and dyspnea, which makes her have to rest. (R. 77). While Ms. Houser stated that she watches television, she said that she sometimes has trouble following television programming, as her "mind wanders." (R. 57-58). As a result, she testified, she often has to rewind her DVR to catch up on what happened in a television show. (R. 58).

Ms. Houser stated that she does crossword puzzles once every two or three weeks, and also

occasionally does Sudoku puzzles. (R. 59-60). Typically she only gets through one third to one half of the crossword before giving up. (R. 74). Additionally, she stated that she was is good at Sudoku either, and when asked by her attorney when the last time was that she was able to finish a Sudoku puzzle, she responded "I don't—I doubt I've completed anything like that in years." (R. 74).

During questioning from her counsel, Ms. Houser testified that she had forgotten to testify regarding her eye problems. (R. 62). She also testified that she sometimes misses her daughter's cheerleading competitions because she's not up to the walking, and that when she does attend, she "gets as close to the time that she's performing as possible, so I don't have to sit there all day." (R 72). Ms. Houser also estimated that she had three "good days" per week. (R 73). During her bad days, she stated that she would typically not go out of the house. (R 73-74).

## 2.
## Vocational Expert's Testimony

At the hearing, Lee Knutson, the Vocational Expert (VE), testified that had familiarized himself with the Ms. Houser's vocational background and that he heard the testimony presented at the hearing. (R. 78). The VE stated that Ms. Houser's previous jobs in accounting were considered to be on the lower end of skilled work and were sedentary in physical demand. (R. 78,79). The ALJ then asked the VE to consider a hypothetical person with Ms. Houser's age, education and past relevant work experience who could perform light work. (R. 80). The VE testified that the hypothetical person would be able to perform their previous job in accounting (R. 80). The ALJ then asked the VE the same hypothetical, but with the claimant being limited to light work that was simple, routine, and repetitive. The VE testified that those limitations would preclude the person's past work experience in accounting. (R. 82). Based on those limitations, the VE testified that there

existed 19,600 assembler positions, 6,700 unskilled inspector positions, and 40,700 unskilled light cashier positions, all which existed in the surrounding economy. (R. 78, 82).

Ms. Houser's counsel then questioned the VE. (R. 84-87). Counsel asked the VE to assume the same hypothetical regarding age, education, and prior work history, but with further limitations of: 1) shortness of breath due to chronic heart failure; 2) a corrected vision of 20/40 and 20/50 in the left and right eyes, respectively; 3) dry eye syndrome and presbyopia; 4) only being able to sit for between an hour and a half and two hours with some movement; 5) only being able to stand 20 minutes to one half hour; 6) only being able to walk up to five blocks before resting for 15 to 20 minutes; 6) being able to lift 10 pounds occasionally; 7) fatigue that limits an ability to complete tasks in a timely manner, and; 8) nausea once or twice per week. (R 85, 85). The VE responded that such limitations would preclude an ability to sustain employment (R. 85).

Ms. Houser's counsel then asked the VE to remove the fatigue and nausea restrictions but add the limitation of a mental disorder that manifested in being off task at least one third of the time. The VE responded that such limitations would also preclude ability to sustain employment. (R. 86-87).

### III.
### THE ALJ'S DECISION

After first determining that Ms. Houser meets the insured status requirements of the Social Security Act, the ALJ found that she had not engaged in substantial gainful activity since her alleged disability onset date of June 9, 2006. (R. 15).

The ALJ then determined that Ms. Houser suffered from severe cardiomyopathy, and a severe history of congestive heart failure. (R. 15). He found that Ms. Houser's colitis was a non-severe ailment because she was able to work in 2001 with the colitis and because she had not sought

any treatment for the colitis until at least eight years after she presented symptoms. (R 15). The ALJ also reasoned that Ms. Houser's treating physicians did not mention any impairment of colitis when they filled out her disability report. (R 15).

The ALJ also found that Ms. Houser's mood disorder was non-severe because it did not cause more than a minimal limitation in her ability to perform basic mental work activities and because it did not manifest severe limitations in her social functioning, concentration, persistence, or pace. (R. 16, 18). The ALJ cited Dr. J.B. Goebel's consultative psychological examination that resulted in no mental health diagnosis. (R. 16). He noted that the examination found Ms. Houser's mood to be bright and cheerful, and that the immediate memory test resulted in Ms. Houser receiving the highest score on the test that the doctor had seen for an adult in 20 years. (R. 16). Further, Ms. Houser's intellectual level was found to be above average, her judgment and insight were normal, and her ability to perform calculations and abstract thinking were in tact. (R. 16). The ALJ pointed out that Dr. Goebel's lack of diagnosis was echoed by two state non-examining psychiatric consultants that found no psychological impairment. (R. 16). Additionally, a third non-examining consultative physician found that Ms. Houser's mood disorder was non-severe. (R. 16). The ALJ additionally reasoned that Ms. Houser's treatment notes give rare mention to any mental health treatment, and that an August 2009 treatment note mentioned that Ms. Houser's Cymbalta was somewhat effective in relieving her depression. (R. 16).

The ALJ gave no weight to Dr. Stevenson's opinion or psychological examination because they were, he said, unsupported by the record. (R. 17). He noted that Dr. Stevenson's findings were at odds with the findings of Dr. Goebel and the three State agency physicians. (R. 17). The ALJ reasoned that Ms. Houser's history of only seeking medication for her mental health issues, rather

than mental health counseling, undermined her credibility. (R. 17). He also found Ms. Houser's statements to Dr. Stevenson that she did not read due to her inability to focus out not credible because she stated during her hearing that she occasionally did crossword puzzles and Sudoku puzzles. (R. 17). The ALJ further disregarded Dr. Stevenson's findings that Ms. Houser could not concentrate or maintain focus because she did not test Ms. Houser's memory and because Dr. Goebel found her memory to be proficient. The ALJ concluded by pointing out that Dr. Stevenson was a one-time consultative examiner rather than a treating physician, and stated that between the two consultative examiners, Dr. Goebel and Dr. Stevenson, he gave greater weight to Dr. Goebel's because it was more consistent with the medical record. (R. 18).

The ALJ then determined that Ms. Houser does not have an impairment or combination impairment that meets or equals one of the listed medical impairments. (R. 18). The ALJ reasoned that Ms. Houser's heart failure has not resulted in "persisted symptoms of heart failure that have seriously limited her ability to perform activities of daily living…" (R. 18). He then found that Ms. Houser retained a residual functional capacity (RFC) to perform the full range of light work as defined by 20 C.F.R. § 404.1567(b). (R. 19). The ALJ noted Ms. Houser's statements that she could walk up to 5 blocks at a time, stand for 20 to 40 minutes, sit for 1 to 2 hours, and lift up to 10 pounds. (R. 19). He also noted that Ms. Houser stated that she does light cooking, occasionally goes shopping, washes dishes, does the laundry, and takes out the garbage. (R. 19).

The ALJ found that Ms. Houser's impairments could reasonably expected to cause her alleged symptoms, however, her statements concerning the intensity, persistence and limiting of the effects are the symptoms were not credible because they were inconsistent with her RFC. (R. 20). The ALJ stated that there was no medical evidence that provided support for Ms. Houser's

allegations, as March 2008 and February 2008 treatment records indicated that her symptoms had improved. (R 20-21). Additionally, the ALJ pointed out that Ms. Houser told consultative physician Dr. Dinesh Jain that she could walk 4 to 5 blocks without dyspnea, and that a non-consulting agency physician explained in May 2009 that Ms. Houser's medical records did not suggest an impairment that would preclude her from working. (R. 21-22).

The ALJ then rejected treating physician Dr. Stengele's opinions that her cardiac impairments limited her functional capacity and activities of daily living. (R. 22). He reasoned that "the record does not document significant symptoms or greater restrictions as a result of [her cardiac] impairments, especially given the claimant's admissions regarding her ability to perform various activities." (R. 23). He stated that the "record fails to document that she is significantly limited as a result of her CHR." (R. 23). The ALJ also made reference to a March 2008 treatment note that said Ms. Houser got "around with [a] lot of exertional symptoms." (R. 23). He also stated that as of December 2008, Ms. Houser stated that her condition was controlled with medication and that she had no dyspnea at rest. (R. 23).

Additionally, in December 2008 Ms. Houser reported shortness of breath upon only moderate exertion. (R. 25). Also, in April 2009 when her ejection fraction was found to be 35%, she was "merely continued on her medications." (R. 25). The ALJ went on to explain that "at her hearing, the claimant admitted on several occasions that she was able to perform at significant exertional levels. She admitted that she could walk five blocks, stand for 20 to 30 minutes, and sit for one to two hours. She also admitted that she could climb two flights of stairs." (R. 25).

The ALJ also dismissed Ms. Houser's claims of debilitating knee pain, back pain, and

nausea, stating that Ms. Houser never mentioned these conditions in her consultative examination and that the medical record consistently failed to mention the conditions. (R. 24). Additionally, the ALJ found that Ms. Houser had no significant vision problems, as her ocular medical records contained unremarkable findings, and her vision with lens correction was "very good near and far." (R. 24).

The ALJ then found that Ms. Houser was unable to perform any of her past relevant work. (R. 25-26). However, the ALJ determined that there existed jobs in significant numbers in the national economy that Ms. Houser could perform. (R. 26). He noted that the VE testified that there existed 19,600 assembler jobs in the region, 6,700 inspector/checker jobs in the region, and 40,700 cashier jobs in the region. (R. 26). He rejected the suggested hypothetical questions given by Ms. Houser's counsel, as he found no evidence that she would be off task one third of the time or that she would have troubles concentrating. (R. 26).

The ALJ concluded by finding that Ms. Houser has not been under a disability as defined in the Social Security from the date of her application, June 9, 2006 through the date of his decision. (R. 27).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402

U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665–66 (7th Cir. 2008).

**B.**

### Five–Step Sequential Analysis

Section 423(d)(1) defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n. 1, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) Is the plaintiff currently unemployed;
> 2) Does the plaintiff have a severe impairment;
> 3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) Is the plaintiff unable to perform her past relevant work; and
> 5) Is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

Ms. Houser claims that the ALJ erroneously determined that her mental impairments were non-severe. (R. 12). This court is not prepared, nor suited, to determine whether Ms. Houser's depressive syndrome may reasonably be characterized as severe. *See Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004). What is clear, however, is that without any discussion, the ALJ completely ignored significant evidence that ran counter to his opinion. As previously discussed, while an ALJ is by no means required to address every piece of evidence in the record, he may not ignore entire lines of evidence that run counter to his opinion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). This is precisely what the ALJ did, resulting in a clear legal error, and, in turn, warranting remand. *Id.*

The ALJ gave no weight to Dr. Stevenson's consultative findings that Ms. Houser was severely depressed because her conclusions, according to the ALJ, ran counter to the medical evidence on record and because Ms. Houser presented as cheerful at a previous consultative evaluation. This reasoning overlooks key evidence.

First, Ms. Houser testified that she has good days and bad days, as presumably most depressive patients do. *Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008). ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.") The ALJ failed to mention this testimony.

Second, Dr. Stevenson's findings were entirely consistent with Ms. Houser's medical record

when considering that Ms. Houser's treating physician increased her antidepressant dosage just one day before the said examination. Again, the ALJ completely ignored this fact.

And that is not all. The ALJ determined that Ms. Houser's depression was non-severe because she had not sought mental health counseling since 2002, opting instead to only seek medication in the form of anti-depressants. This reasoning is riddled with shortcomings. First, as Ms. Houser points out, a failure to seek mental health treatment may indeed "be the result of the mental illness rather than evidence that a mental impairment is non severe." *See* 20 C.F.R. § 416.918 (requiring the ALJ to "consider physical, mental, educational, and linguistic limitations . . . when determining if you have a good reason for failing to attend a consultative examination."); *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006)("Mental illness… may prevent the sufferer from taking per prescribed medicines or otherwise submitting to treatment"); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)("It is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."). The ALJ does not even consider such a possibility.

Second, Ms. Houser discussed her depression issues with her treating physicians, and her medical records indicate frequent increases in antidepressant doses and periodic changes in the type of medication prescribed. This hardly suggests an indifferent patient. Again, the ALJ entirely ignored these facts.

Perhaps most troubling, however, Ms. Houser provided a specific reason for not seeking psychological counseling. Ms. Houser explained that when she previously attended mental health counseling in 2000-2002, she found it to be ineffective. The ALJ must, at least, consider such a reason. SSR 96-7p, 1996 WL 374186, at n.7 ("[T]he adjudicator must not draw any inferences about

23

an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Another key piece of evidence overlooked by the ALJ regards Ms. Houser's ability to do housework. The ALJ reasoned that her ability to do light housework underscored his RFC determination. Ms. Houser, however, testified that she can typically only clean one room, or one half of one room, at a time. After that she must stop and sit down in order to catch her breath. As a result, Ms. Houser testified, her house is never completely clean. The ALJ made no mention of these limitations. Rather, he relied on Ms. Houser's ability to do housework in concluding that her heart failure did not result in a limitation in daily living activities. The ALJ is required to consider Ms. Houser's testimony in this regard. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (the ALJ must not disregard a claimant's limitations in performing housework); *see also Hughes v. Astrue*, 705 F.3d 276 (7th Cir. 2013) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("We have remarked [sic] the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment. The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter […] and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases".) (internal quotation marks omitted).

The ALJ's repeated legal errors in ignoring significant, contrary evidence resulted in an

improper Step 3 determination. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The remainder of Ms. Houser's arguments need not be addressed and remand is warranted. *Arnold v. Barnhart*, 473 F.3d 816, 821 (7th Cir. 2007).

**CONCLUSION**

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 9/24/13